Lew Rose and Fan Rose v. Commissioner.
Rose v. Commissioner
Docket No. 83866.
United States Tax Court
T.C. Memo 1962-76; 1962 Tax Ct. Memo LEXIS 232; 21 T.C.M. (CCH) 396; T.C.M. (RIA) 62076; April 6, 1962
*232 Vincent B. Lewin, Esq., and Myron Bush, Esq., 60 E. 42nd St., New York, N. Y., for the petitioners. Theodore E. Davis, Esq., and Lionel Savadove, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion RAUM, Judge: The Commissioner determined the following deficiencies in petitioners' income tax for 1952 and 1953 and additions to tax as follows: Additions to Tax,
I.R.C. 1939
Sec.
Sec. 294
Year
Deficiency
293(b)
(d)(2)
1952
$30,523.29
$15,261.65
$1,849.25
1953
29,597.72
14,798.86
1,769.86
Petitioners, husband and wife, reside in New York. They filed their joint income tax returns for the taxable years with the director of internal revenue, Upper Manhattan District of New York. Lew Rose will sometimes hereinafter be referred to as the petitioner. During the taxable years petitioner was the president and sole stockholder of Lew Rose, Inc., a corporation engaged in selling household appliances, primarily at retail, in New York City. He was also the sole proprietor of Rose Distributing Co., a companion enterprise conducted at the same premises, which was engaged as a manufacturer's agent and jobber *233 in the sales of household appliances. On April 8, 1954, the corporation was adjudicated a bankrupt on a petition filed against it on February 18, 1954. The proprietorship made an assignment for the benefit of creditors on October 22, 1953. The matters requiring adjudication herein are as follows: 1. Unexplained income. The Commissioner determined that petitioner had "additional income" for 1952 and 1953 in the respective amounts of $55,008.62 and $51,766.28, which were unreported. These amounts were based upon the corporate books of Lew Rose, Inc. as aggregates of amounts appearing as deposits by Lew Rose to the corporate account, which were credited to a "loans and exchange" account and credited to petitioner on the corporate books. The Commissioner treated these amounts as "unexplained deposits" by petitioner, and charged him with taxable income in respect thereto. We heard testimony and received certain documentary evidence with respect to this issue, and are satisfied that these items do not represent taxable income. They fall into two categories: (a) actual loans made by various persons (including a partnership of which petitioner's wife was a partner) to the corporation, *234 most of which were repaid by the corporation by checks that were given simultaneously with the loans and which were cashed within a relatively brief period thereafter; and (b) certain sales made by the corporation which did not represent deposits into the corporate account by the petitioner at all, contrary to the corporate books. The second category accounts for most of these so-called unexplained deposits. Such bookkeeping entries arose in the following manner: The corporation had been selling some appliances at prices below those fixed in accordance with so-called fair trade legislation. It was being sued by such manufacturers as General Electric and Sunbeam for violation of the fair trade laws. In an effort to conceal those sales made below legal prices, the corporation issued separate invoices for such sales, referred to as "M" numbered invoices, and these sales were not recorded on the corporate books as sales. However, the receipts from such sales were deposited in the corporation's account but were treated on its books as "exchanges" or "loans" from petitioner. [1] Although the story which was thus related to us at the trial appeared to be strange, we nevertheless found it *235 credible and we hereby find as a fact that it is truthful. We hold and find that the so-called unexplained deposits at issue herein are attributable to the two categories of transactions set forth above, and that they do not represent taxable income to petitioner. The Government contends in a memorandum, filed after the trial, that the proceeds of the unrecorded corporate sales were available to the petitioner and are therefore taxable to him. It relies on certain testimony by petitioner that such proceeds were deposited to the "account of Lew Rose". Apart from the fact that this was not pleaded, we think the record does not support the Government's newly articulated theory. Reading the testimony in proper context we do not believe that petitioner in fact testified that the proceeds of these sales were deposited in his own account. Taken in isolation, the words quoted above would suggest that he did so testify. However, whether a reporter's oversight was responsible for the omission of the "Inc." after "Lew Rose" *236 in the transcript, or whether petitioner loosely used the term "Lew Rose" to refer to his corporation, [2] we are satisfied from the record as a whole as well as our recollection of that testimony that petitioner did not testify that the proceeds were deposited in his own account. To the contrary, we interpret the testimony as a whole as showing that the proceeds were deposited in the corporate account. There is no convincing evidence that such proceeds ever found their way into petitioner's hands, or that he ever had the benefit of such proceeds. The mere bookkeeping entries in this case, setting up false obligations from the corporation to petitioner did not, in the circumstances of this case, represent the realization of income by petitioner. In substance, the evidence does show that the corporation received such proceeds from the purchasers, but in an effort to conceal their source, made false entries on its books to make it appear that they were deposited in its account by petitioner. However, petitioner did not in fact make any such deposits, and there is no sound basis in this record for the conclusion that the funds were ever received by petitioner. The point has no merit. The *237 situation is to be sharply distinguished from , affirmed, (C.A. 2), certiorari denied, , where the Court was satisfied that the dominant stockholders "personally received the amounts from the sale of cars in excess of the prices shown on the books and through that method each retained an equal portion of the additional income of the corporation for the taxable year." (.) Cf. , remanded, (C.A. 6).
*238 2. Unreported interest income. The Commissioner charged petitioners with unreported interest income in the amounts of $1,527.95 and $1,054.96 for the years 1952 and 1953, respectively. A stipulation of facts filed herein discloses that petitioners maintained eleven savings bank accounts which were credited with interest in the foregoing amounts during the taxable years, and that such interest was unreported. The evidence further shows that such bank accounts had been put up as collateral for bank loans made by Lew Rose the proceeds of which he in turn advanced to his corporation. The bank books were thus not in his possession during the taxable years; he did not know what interest had in fact been credited to those accounts; the lending bank subsequently foreclosed upon the collateral; and petitioner never did get these bank books back. There is no dispute between the parties that notwithstanding the foregoing circumstances, the items of bank interest credited upon these bank books were properly chargeable to petitioners, and the Commissioner's adjustment in respect thereof is hereby approved. 3. Long term capital loss. The Commissioner disallowed a $1,000 deduction claimed *239 on the return for 1953. The deduction was claimed by reason of the corporation's hopeless financial condition in 1953; petitioner thereby suffered a loss of his investment, particularly the advances which he had made to the corporation from his bank loans with respect to which the bank had foreclosed on his collateral in 1953. Such loans were in excess of $40,000. Petitioner was justified in claiming the loss as a long term capital loss, and the deduction therefore was properly limited to $1,000 in 1953. 4. Loss from business. The Commissioner disallowed deductions for losses in the amounts of $4,418.41 and $16,489.62 for the years 1952 and 1953, respectively. These losses were allegedly incurred by petitioner's sole proprietorship. Petitioner presented no convincing evidence that the Commissioner erred in respect of these items. He undertook to excuse his inability to present evidence by reason of unavailability of his books which had been turned over to a trustee for the benefit of creditors. Although we heard a considerable amount of testimony about the unavailability of those books the fact remains that the burden was upon the petitioner to show error in the Commissioner's determination *240 in this connection, and he has failed to do so. This adjustment must be approved for failure of proof. 5. Income from bonus. An item of $1,631.93 was added by the Commissioner to petitioners' income for 1953 as a bonus received upon the cancellation of a lease which the Commissioner treated as unreported. This bonus was paid for the premature termination of a lease in which the sole proprietorship was the lessee. Upon the basis of testimony presented to us, we are satisfied that this item was in fact reported. The adjustment must therefore be disapproved. 6. Miscellaneous deductions. The Commissioner disallowed deductions for contributions, interest and taxes in the amounts of $175, $457.50, and $38.60, respectively, for 1952. His adjustment in this respect must be approved for failure of any proof that he erred. On the basis of the record before us petitioners appear to be entitled merely to the standard deduction, and they do not contend otherwise. 7. Fraud. The Commissioner seeks to support his additions for fraud by reliance upon items 1, 2, and 4, supra. Our conclusion on the first issue in petitioners' favor deprives it of any basis for a finding of fraud. And although *241 the other two issues have been decided herein against petitioners, the state of the record is such that we cannot find that the Commissioner has carried his required burden of proving fraud by clear and convincing evidence. Decision will be entered under Rule 50. Footnotes
1. A subsequent audit of the corporation's books by the Commissioner resulted in deficiency assessments against the corporation in respect of such unreported sales.↩
2. The transcript at that point reads as follows: Q. In the opening statements made by counsel for respondent, you may or may not have heard the statement made that as assessment was made against the corporation, Lew Rose, Inc., based upon sales records under an "M" number. Do you recall that? A. Yes. Q. Those sales made by Lew Rose, Inc., under an "M" number, were they recorded on the books of Lew Rose, Inc. as sales? A. They were recorded as loans and exchanges. Q. In other words, all of the sales made under the "M" numbers were recorded as loans and exchanges on the books of Lew Rose, Inc.? A. Yes. Q. Why was it done in that manner? A. Because we were being sued by Sunbeam for $25,000, General Electric for about $25,000 and a few others. Under the Fair Trade Acts, they had the right to come in and examine the books. If they caught you on anything selling below the retail price, they would fine you accordingly and they would get a judgment accordingly. Q. And these "M" sales was a code to you that they represented sales made under the Fair Trade Act prices, is that correct? A. Yes. Q. That was the code you used in your memo books, is that correct? A. Yes. Q. And those sales were never included in your books as sales? A. No. Q. But they did go in and the checks that were received on those sales, were they actually deposited in the account of Lew Rose, Inc.? A. They were all deposited on the account of Lew Rose. Q. Every check? A. Every check. Q. But you treated them as a loan and exchange coming from you? A. Yes.↩